Anthony J. Di Giovanna, J.
On September 13, 1965 there appeared before me the infant plaintiff, her guardian and her attorney, together with defendant’s counsel, and following a discussion the court permitted this action to be settled in the sum of $4,500. The court permitted this amount only because of the tenuous nature of the liability.
The proposed order of compromise has now been submitted. In it is provided for the payment to two doctors of fees of $375 and $250 each, respectively.
As appears from the affidavit of the father, following the accident on July 31, 1963, the infant was taken to Coney Island Hospital where she remained until August 14, 1963 and was again readmitted from February 18, 1964 until February 26, 1964. The infant is still being treated at the Coney Island Hospital clinic and a deformity of the right thumb and limitation of movement of said thumb are permanent.
An affidvait has been submitted by a doctor in which he says as follows: “That the infant was examined and treated at the Coney Island Hospital for the following injuries * * *. That the infant is still being treated at the Coney Island Hospital clinic * # *. That your deponent’s fee for services rendered the infant is $375 which is still due and owing.” It may be noted that nowhere does it say that the infant was treated by this doctor. The only reference made to the second doctor is that contained in the affidavit of the guardian ad litem as follows: ‘ ‘ That there are still due and owing the sum of $395.50 to the Coney Island Hospital; the sum of $250 to Dr. * * * and the sum of $375 to Dr.”. Not a word is said concerning the services rendered by the second doctor.
The plaintiffs’ attorney has now submitted a letter from a firm of attorneys which reads in part as follows: “ We represent the above physician who holds an assignment authorizing him to collect the amount of his charge for services rendered out of any recovery in the above patient’s personal injury action claim.” That apparently purports to be an assignment of the proceeds of a personal injury action. Justice Amsterdam held such assignment to be invalid by reason of the provisions of subdivision 1 of section 41 of the Personal Property Law in Norick v. New York Med. Coll. (N. Y. L. J., June 19, 1964, p. 13, col. 7).
However, in Grossman v. Schlosser (19 A D 2d 893, 2d Dept., 1963 [predating the Norich decision]) the court held that an *719 assignment of the proceeds of a personal injury action prior to the disposition of the action was not against public policy, citing Williams v. Ingersoll (89 N. Y. 508). Following chronologically, section 41 of the Personal Property Law was altered by section 13-101 of the General Obligations Law to read as follows:
1 ‘ Any claim or demand can be transferred, except in one of the following cases:
“ 1. Where it is to recover damages for personal injury;
* « *
“3. Where a transfer thereof is expressly forbidden by a statute of the state, or of the United States, or would contravene public policy.”
In Practice Commentary by Ralph D. Semerad (McKinney’s Cons. Law of N. Y., Book 23A, General Obligations Law, § 13-101, pp. 545-546) the following is said: “ This is former subdivision (1) of section 41 of the Personal Property Law. It states the general rule that choses in action are assignable and lists three exceptions. A claim for personal injury, not reduced to judgment, cannot be assigned. Transfers contravening public policy are also forbidden. This is a broad category which apparently encompasses everything from an illegal contract to one that is personal in nature. Non-assignability may be absolute, as in the case of personal injury claims, or it may be intended as a protection to the obligor, who may waive the restriction.”
Reference to the record on appeal in the Grossman case shows that the assignment therein of the proceeds of a personal injury action reads in part as follows: “In order to induce Grossman and Leipziger to modify and extend a certain obligation of $7500 with interest owed by the above plaintiff, arising out of a certain assumption of notes secured by a purchase money chattel mortgage * * * inclusive of additional moneys advanced therefor, the undersigned plaintiff does hereby acknowledge said personal obligation and herewith collaterally secures the repayment of said $7500 plus interest, by assigning to * * * all of my right, title and interest to such moneys arising from my net recovery in the above captioned action, exclusive of counsel fees.”
However in Shapira v. United Med. Serv. (15 N Y 2d 200) the Court of Appeals dealt specifically with the rights of physicians in public hospitals to collect fees from a patient who has been admitted thereto by reason of personal injuries. 'While that action was against a nonprofit medical indemnity corporation to recover under a policy held by the injured insured, the *720 same principles would apply to this case now under consideration. Each doctor therein involved asserted ‘1 that he rendered medical care to the patient subscribers involved herein and out of this treatment there arose the respondent’s obligation under its service contracts to reimburse him for his care.” The defendant contended that it would owe money to doctors only where a subscriber has incurred liability to his doctor for a professional fee. If the patient need not pay the practitioner for the care that he receives, the respondent asserts that it need not pay. The doctors therein were on the visiting staff of a municipal hospital and received a salary from the Einstein College of Medicine for services performed in several hospitals. A patient is admitted to the hospital either through the emergency room or from an out-patient clinic after being examined there by an interne or resident. If emergency treatment is in order it is administered by the interne or resident. The residents and internes in the ward are in turn supervised by a chief resident. Visiting physicians are assigned to tours of duty and are regularly assigned to the hospital center’s surgical service. The head of the service becomes the attending physician in effect on the entry of a patient by reason of his relationship to the internes and residents. The patient has no choice of physicians. A particular patient comes in contact with a particular physician only by reason of the chance assignment to that branch of the hospital in which the doctor is assigned and may, under certain circumstances, be treated by several physicians.
The court said (pp. 209-210, 213-214): “ Since the United Medical Service contracts provide benefits only where a subscriber has incurred liability to a physician for a professional fee, the major issue at the trial was whether the three subscribers did incur any liability to appellants for such a fee. The cause of action cannot be built on an express contract with the subscribers. The question is whether a cause of action on an implied contract exists at common law.” It then considered the issue as to whether an implied contract exists and the court said (p. 210): “ Appellants, therefore, had to show, unless there is a presumption of liability arising from the mere rendition of services, that the subscribers in some way engaged appellants, rather than the Bronx Municipal Hospital Center, to cure them. Appellants also had to show that appellants accepted the subscribers as their patients, and that, under the circumstances, it was mutually understood, at the time services were rendered, that appellants would be personally compensated by the subscriber * * *.
*721 “ Thus it is found that none of the subscribers were private patients of the appellants; that the subscribers came in contact with appellants purely as the fortuitous result of the hospital center’s system of assigning patients and physicians to the respective wards, that there was no evidence that any of the subscribers, or Miss Sinnette’s parents, ever requested any of the appellants to give them medical or surgical care or treatment; during the period that the subscribers were in the hospital center none of the appellants expected that they would be compensated with respect to any of the services received by the subscribers during their hospitalization; none of the appellants rendered services to the subscribers in the recognized personal relationship of physician and patient. * * *
“ Here the subscribers expected the hospital center to attempt to cure them, and the hospital center undertook to do so. The hospital center, through its residents and interns, decided that Messrs. Schmier and Tobias, and Miss Sinnette should be admitted to the hospital center. The hospital center decided to what wards the patients should be admitted, and it was that decision which determined the physicians with whom the subscribers would come in contact. The hospital center assigned many physicians to the ward services to which the subscribers were also assigned.
‘‘ Freedom to choose one’s physician is an element which would buttress a claim of a contract on the part of the patient to pay the physician a fee (Beekman Downtown Hosp. v. Murphy, 203 Misc. 121; Roosevelt Hosp. v. Loewy, 185 Misc. 113). In the Beekman case [supra) * * * the court held, at page 123: ‘ Concededly the defendant was an ambulance patient treated in the ward of the plaintiff hospital; as such he “ has no freedom of choice or of contract or terms in respect of a physician who attends him at such hospital.” (Roosevelt Hosp. v. Loewy, 185 Misc. 113, 114.) It would appear therefore, that there is no contractual relationship, either express or implied in law, upon which any such treating surgeon could predicate a cause of action against a ward patient.’
“ These subscribers, however, not only lacked the choice of physicians, they never had a physician of their own. The subscribers were not private patients of the appellants. Indeed, appellants were prohibited from having private patients at the hospital center. It is evident that none of the appellants was in a position to enter into such a relationship with subscribers. The rules of the hospital center forbade it. The fact that there was no personal relationship between appellants and *722 the subscribers furnishing a basis for a professional fee enabled Dr. Scheinberg and Dr. Sands on, without fear of malpractice liability, to abandon Mr. Schmier and Mr. Tobias by leaving them in the middle of their hospitalizations. They could not have abandoned them had they been ‘ their patients ’. The rule is well established that once a physician accepts a patient he must continue to serve the patient during his illness unless he gives the patient timely notice so that he may engage another doctor or unless, of course, the patient consents to his leaving the case. The subscribers had no right to have appellants as their physicians. Their engagement was with the hospital center, not with the appellants. Patients in such circumstances are not liable for the services rendered by the visiting physicians.” The court disposed of the issue of presumptive liability, holding that the mere rendition of the services under those circumstances did not constitute a contract. Argument was further made that because the subscribers did not object to these doctors treating them, a presumption arose of obligation to pay. In disposing of this argument the court said (p. 215): “ In this case the subscribers did not assent and they were in no position to assent or object to the appellants’ treatment. They were not free to object. The hospital center had agreed to provide care and treatment and the appellants were assigned in accordance with the contract between the university and the center. The subscriber had no cause to protest, because they expected the hospital to provide all necessary medical services, which it did. "When such a relationship exists may be defined but the law does not readily imply the relation.” Without further citing parts of the decision, it is clear that the Court of Appeals frowned upon the practice of physicians in public hospitals charging for services.
The use of assignments, such as was presented to the court in this case, has been the subject of severe criticism in the past. Not one single treatment was rendered outside of the hospital. Under the Shapira case the plaintiffs owed nothing to these doctors. The assignment, therefore, in my opinion, is contrary to public policy because the doctors would be getting something to which they are not entitled. There has been absolutely no consideration for such assignment.
I perceive no difference between a patient treated for personal injuries or for any other illness. If this practice is permitted to continue, of exacting assignments from patients injured in an accident, then it is quite probable that similar exactions will be 'made from other side persons even though they have not *723 deliberately set out to hire these physicians but have placed themselves in a hospital for its care and maintenance.
Under the circumstances the court refuses to recognize the so-called assignment and has signed the compromise order deleting the provision therefrom.